# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BRITTANY A.,[1] | : | Case No. 2:23-cv-04082 |
| | : | |
| Plaintiff, | : | District Judge James L. Graham |
| | : | Magistrate Judge Caroline H. Gentry |
| vs. | : | |
| | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

---

## REPORT AND RECOMMENDATIONS[2]

---

Plaintiff filed an application for Supplemental Security Income (SSI) in January 2018. Plaintiff's claim was denied initially and upon reconsideration. After a hearing at Plaintiff's request, the Administrative Law Judge (ALJ) concluded that Plaintiff was not eligible for benefits because she was not under a "disability" as defined in the Social Security Act. After the Appeals Council denied Plaintiff's request for review of that decision, Plaintiff filed an action with this Court.[3] The Court remanded the case to the Commissioner under Sentence Four of 42 U.S.C. § 405(g). The Appeals Council remanded the case pursuant to the District Court's order. A different ALJ held another

---

[1] *See* S.D. Ohio General Order 22-01 ("The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that due to significant privacy concerns in social security cases federal courts should refer to claimants only by their first names and last initials.").

[2] *See* 28 U.S.C. § 636(b)(1). The notice at the end of this opinion informs the parties of their ability to file objections to this Report and Recommendations within the specified time period.

[3] Assigned to District Judge Sarah D. Morrison, Case Number 2:20-cv-06549.

hearing and again concluded that Plaintiff was not under a "disability" as defined in the Social Security Act. The Appeals Council denied Plaintiff's request for review of that decision, and Plaintiff subsequently filed this action.

Plaintiff seeks an order remanding this matter to the Commissioner for the award of benefits or, in the alternative, for further proceedings. The Commissioner asks the Court to affirm the non-disability decision. For the reasons set forth below, it is recommended that the Court REVERSE the Commissioner's decision and REMAND for further proceedings.

## I.    BACKGROUND

Plaintiff asserts that she has been under a disability since August 1, 2010.[4] She was twenty-five years old on the SSI application date. Accordingly, Plaintiff was considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 416.963(c). Plaintiff has a "high school education and above." *See* 20 C.F.R. § 416.964(b)(4).

The evidence in the Administrative Record ("AR," Doc. No.  7) is summarized in the ALJ's decision ("Decision," Doc. No. 7-8 at PageID 797-825), Plaintiff's Statement of Errors ("SE," Doc. No. 9), the Commissioner's Memorandum in Opposition ("Mem. In Opp.," Doc. No. 10), and Plaintiff's Reply Memorandum ("Reply," Doc. No. 11).

---

[4] Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. Thus, the relevant period of consideration in this case begins on January 2, 2018. *See* 20 C.F.R. § 416.335; *Koster v. Comm'r of Soc. Sec.*, 643 F. App'x. 466, 478 (6th Cir. 2016) ("For purposes of SSI, which is not retroactive, the relevant period here is . . . the date [the plaintiff] filed his protective application.").

Rather than repeat these summaries, the Court will discuss the pertinent evidence in its analysis below.

## II. STANDARD OF REVIEW

The Social Security Administration provides SSI to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 402, 423(a)(1), 1382(a). The term "disability" means "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

This Court's review of an ALJ's unfavorable decision is limited to two inquiries: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). "Unless the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence," this Court must affirm the ALJ's decision. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). Thus, the Court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Id*.

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)

(citation omitted). This limited standard of review does not permit the Court to weigh the evidence and decide whether the preponderance of the evidence supports a different conclusion. Instead, the Court is confined to determining whether the ALJ's decision is supported by substantial evidence, which "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted). This standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). Thus, the Court may be required to affirm the ALJ's decision even if substantial evidence in the record supports the opposite conclusion. *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir.1997).

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009). "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Id.* (citations omitted). Such an error of law will require reversal even if "the outcome on remand is unlikely to be different." *Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (internal quotations and citations omitted).

## III. FACTS

### A. The ALJ's Factual Findings

The ALJ was tasked with evaluating the evidence related to Plaintiff's application for benefits. In doing so, the ALJ considered each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 416.920. The ALJ made the following findings of fact:

Step 1: Plaintiff has not engaged in substantial gainful activity since January 2, 2018, the SSI application date.

Step 2: She has the severe impairments of morbid obesity, hypothyroidism, anemia, obstructive sleep apnea, lymphedema, and affective, anxiety, attention deficit disorder, binge eating, and trauma/stressor-related mental disorders.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4: Her residual functional capacity (RFC), or the most she can do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of sedentary work as defined in 20 C.F.R. § 416.967(a), subject to the following limitations: "[S]he can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She can perform in work settings with no strict production quotas or fast-paced work such as on an assembly line. She can occasionally interact with the general public."

She has no past relevant work.

Step 5: Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform.

(Decision, Doc. No. 7-8 at PageID 802-17.) These findings led the ALJ to conclude that Plaintiff does not meet the definition of disability and so is not entitled to benefits. (*Id.* at PageID 817-18.)

### B.    State Agency Psychological Consultants

State agency psychological consultant Joseph Edwards, Ph.D. completed a Disability Determination Explanation form in May 2018. (AR, Doc. No. 7-3 at PageID 87-94.) Dr. Edwards found moderate impairment in all of the "B Criteria" areas (understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself). (*Id.* at PageID 89.) In the mental RFC section of the form, Dr. Edwards indicated that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, and opined that Plaintiff could understand and remember one- to four-step instructions. (*Id.* at PageID 93.) In the area of sustained concentration and persistence, Dr. Edwards found moderate impairment in the abilities of carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically-based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) He opined that Plaintiff was "capable of [one- to four]-step tasks in a static environment without strict time or production quotas. (*Id.*)

Regarding social interactions, Dr. Edwards indicated moderate impairment in Plaintiff's ability to interact appropriately with the general public, to ask simple questions

6

or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR, Doc. No. 7-3 at PageID 93-94.) According to Dr. Edwards, Plaintiff was limited to "superficial and intermittent contact with others, in less public settings." (*Id.* at PageID 94.) In the final area of adaptation, Dr. Edwards found moderate limitation in Plaintiff's ability to respond appropriately to changes in the work setting. (*Id.*) He opined: "Major changes should be explained in advance with gradual implementation to allow for adjustment." (*Id.*)

Kristen Haskins, Psy.D., reviewed the updated record at the reconsideration level in June 2018. (AR, Doc. No. 7-3 at PageID 105-10.) Dr. Haskins opined that in the area of sustained concentration and persistence, Plaintiff was further limited to "short[-]cycle tasks." (*Id.* at PageID 109.) Dr. Haskins otherwise adopted Dr. Edwards' assessment. (*Id.* at PageID 105-10.)

The ALJ concluded that the state agency psychological consultants' assessments were "unpersuasive." (Decision, Doc. No. 7-8 at PageID 814.) The ALJ reasoned that the consultants "failed to support the need for a limitation to [one- to four]-step instructions, changes to be explained in advance, or to intermittent contact." (*Id.*) The ALJ explained that to the contrary, the consultants "noted that the evidence does not show any cognitive limitations" and "did not provide detailed citations to the record to support the specific limitations they indicated." (*Id.* at PageID 814-15.) The ALJ also reasoned that the consultants' limitations were "inconsistent with the record." (*Id.* at PageID 815.) The ALJ explained that although Plaintiff "usually had a depressed mood and flat affect . . . it

7

did not appear to significantly affect other mental status functioning." The ALJ further

explained:

> Rather, as summarized above, mental status exam findings routinely
> document that she was cooperative, had clear speech, normal cognition,
> average intelligence, and only mildly impaired judgment, despite her
> significant reported mental symptomatology. Mental status exams typically
> also showed logical thought content, except for occasional indication of
> depressed thought content. She had no reported difficulty interacting with
> various providers during her numerous medical and mental health
> counseling visits. Although she reported that she rarely went out and
> socialized, mental health progress notes reflect that she led a fairly active
> lifestyle. She was able to sell her artwork, keep up a fan page, participate in
> craft shows, attend concerts, engage with strangers at coffee shops and
> parks, attend parties, visit with friends, go on dates, and drive to Chicago
> and Texas (Exs. 13F and 18F).

(*Id.* at PageID 815.)

## C. Consultative Psychologist Nicolaas Dubbeling, Ph.D.

Nicolaas Dubbeling, Ph.D. performed a consultative psychological evaluation in

January 2020. (AR, Doc. No. 7-7 at PageID 787-91.) Dr. Dubbeling provided a narrative

report and documented the mental status examination findings that he observed during

the evaluation. (*Id.* at PageID 787-89.) He also completed a mental capacities assessment

checkbox form. (*Id.* at PageID 790-91.) Dr. Dubbeling checked boxes to indicate his

opinion that Plaintiff was "[u]nable to meet competitive standards" (defined as

"noticeable difficulty . . . from [twenty-one] to [forty] percent of the workday or work

week") in the following mental abilities and aptitudes: remembering work-like

procedures; maintaining attention for two-hour segments; maintaining regular attendance

and being punctual within customary, usually strict tolerances; working in coordination

with or proximity to others without being unduly distracted; completing a normal

8

workday and workweek without interruptions from psychologically-based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; dealing with normal work stress; understanding, remembering, and carrying out detailed instructions; interacting appropriately with the general public; maintaining socially-appropriate behavior; adhering to basic standards of neatness and cleanliness; traveling in unfamiliar places; and using public transportation. (*Id.*)

Dr. Dubbeling also checked boxes to opine that Plaintiff was "[s]eriously limited" (defined as "noticeable difficulty . . . from [eleven] to [twenty] percent of the workday or work week") in the following abilities and aptitudes: understanding and remembering very short and simple instructions, sustaining and ordinary routine without special supervision; making simple, work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; setting goals or making plans independently of others; and dealing with the stress of semiskilled and skilled work. (AR, Doc. No. 7-7 at PageID 790-91.) Dr. Dubbeling further opined that Plaintiff's impairments and treatment would cause her to be absent from work for more than four days per month. (*Id.* at PageID 791.)

When asked to explain the limitations that he assessed regarding Plaintiff's difficulty with completing unskilled work, Dr. Dubbeling wrote: "She grew up in a dysfunctional family and was raped at age seven or eight by the boyfriend of her mother. She is poorly socialized and prefers to isolate herself. She prefers artistic painting to any

other activity." (AR, Doc. No. 7-7 at PageID 790.) For the areas addressing Plaintiff's

ability to perform semiskilled and skilled work, Dr. Dubbeling reasoned: "Mental status

is positive for almost constant depression and social anxiety." Finally, Dr. Dubbeling

explained the additional limitations that he assessed:

> She lacks common sense and basic interactional skills to interact normally
> with the general public. She has limited standards of neatness and
> cleanliness. She would be rather anxious if she has to travel to unfamiliar
> places due to social anxiety. Using public transportation is totally not
> present due to social anxiety.

(*Id.* at PageID 791.)

The ALJ concluded that Dr. Dubbeling's opinion was "unpersuasive." (Decision,

Doc. No. 7-8 at PageID 814.) The ALJ acknowledged that Dr. Dubbeling is a board-

certified clinical psychologist but noted that he evaluated Plaintiff on only one occasion.

(*Id.*) The ALJ also reasoned that Dr. Dubbeling's "own examination report does not

support the extent of the limitations he opined." (*Id.*) The ALJ explained:

> His mental status exam findings showed [an] anxious mood, reported daily ideas
> of reference, and inability to list the month of the year backwards and perform
> some arithmetic. However, [Plaintiff] was alert, fully oriented, adequately
> groomed, cooperative, and relaxed with good eye contact, normal speech, intact
> abstract thinking, average intellectual functioning, ability to interpret proverbs,
> intact immediate, short-term, and remote memory, and intact insight. (Ex. 19F/1-
> 3).

(*Id.*)

The ALJ further explained that Dr. Dubbeling's opinion was "not fully consistent

with the record as a whole":

> [Plaintiff] was hospitalized during the period at issue for thoughts of self-
> injurious behavior with plans, but her medications were adjusted and her
> symptoms improved, and she was discharged in stable condition. (Exs.

11F/28, 38; 14F/14, 29, 30; and 26F/48). Although she reported that she rarely went out and socialized, mental health progress notes reflect that she led a fairly active lifestyle. She was able to sell her artwork, keep up a fan page, participate in craft shows, attend concerts, engage with strangers at coffee shops and parks, attend parties, visit with friends, go on dates, and drive to Chicago and Texas. (Exs. 13F and 18F). Mental status exams showed some depressed mood and fair insight and judgment, but were otherwise unremarkable, as [Plaintiff] was alert, fully oriented, well-groomed, and cooperative with appropriate affect, good eye contact, no agitation, normal speech, appropriate thought processes, focused memory, average fund of knowledge, and average intelligence. (Exs. 8F/7; 12F/10; and 18F/5, 14, 21, 28, 38, 45, 53, 62, 69, 83).

(*Id.*)

## IV.    LAW AND ANALYSIS

Plaintiff asserts that the ALJ erred in his analysis of the medical opinions of the state agency psychological consultants and consultative psychologist Dr. Dubbeling. (SE, Doc. No. 9 at PageID 1769, 1778.) According to Plaintiff, the ALJ "failed to adequately evaluate the supportability and consistency factors in compliance with 20 C.F.R. § [416.920c]." (*Id.*) For the reasons discussed below, Plaintiff's contentions are well-taken and the ALJ's decision should be reversed.

### A.    Applicable Law.

ALJs are required to analyze the persuasiveness of "***all*** of the medical opinions" in the record. 20 C.F.R. § 416.920c (emphasis added). A "medical opinion" is a "statement from a medical source about what [an individual] can still do despite [his] impairment(s)" and whether the individual has one or more impairment-related limitations or restrictions. 20 C.F.R. § 416.913(a)(2). By contrast, a statement from a medical source about an issue

reserved to the Commissioner—such as whether an individual is disabled—need not be addressed by the ALJ. 20 C.F.R. § 416.920b(c)(3).

Because Plaintiff filed her claim after March 27, 2017, the new regulations for evaluating medical opinion evidence applied. Under these regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 416.920c(a). Instead, the ALJ must evaluate the persuasiveness of each medical opinion and prior administrative medical finding by considering the following factors: (1) supportability; (2) consistency; (3) relationship with the plaintiff; (4) specialization; and (5) any other factor "that tend[s] to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 416.920c(c).

The first two factors—supportability and consistency—are the "most important." 20 C.F.R. § 416.920c(b)(2) (emphasis added). The supportability factor recognizes that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. § 416.920c(c)(1). Therefore, an ALJ's supportability analysis addresses whether a medical professional has sufficient justification for their *own* conclusions. *See Crystal E.J. v. Comm'r of Soc. Sec.*, No. 2:21-CV-04861, 2022 WL 2680069 (S.D. Ohio July 12, 2022) (Preston Deavers, M.J.); *accord Burke v. O'Malley*, No. 8:23-cv-415, 2024 U.S. Dist. LEXIS 48944, *8 (M.D. Fla. Mar. 20, 2024) ("Supportability addresses the extent to which a medical source or consultant has articulated record evidence bolstering her own opinion or finding.").

12

The consistency factor, by contrast, recognizes that "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 416.920c(c)(2). The ALJ's consistency analysis therefore must compare the medical opinion at issue to evidence from "*other* medical and nonmedical sources." *Ford v. Comm'r of Soc. Sec.*, No. 1:22-CV-00524, 2023 WL 2088157, at *17 (N.D. Ohio Jan. 31, 2023).

The distinction between the supportability and consistency factors is relatively clear when the opinion is from a treating provider. Providers commonly rely on the records in their possession—including progress notes, test results, statements from the claimant, and opinions from other medical providers—to support their medical opinions. An ALJ can readily identify a provider's records that purportedly support their opinion and use them to analyze supportability. Then, when analyzing consistency, the ALJ can readily compare the provider's opinion to opinions and evidence from ***other*** providers. Because each factor (supportability and consistency) considers different evidence, the reviewing court can easily determine whether the ALJ has addressed each factor.

It can be more challenging to distinguish between supportability and consistency when the opinion is from a state agency consultant. Because they do not have their own treatment records, consultants must review and rely upon documents in the administrative record to support their opinions. The ALJ will, however, consider documents from the same administrative record when analyzing both supportability and consistency. If the consultant's report clearly identifies the documents relied upon to support their opinions,

then the ALJ can conduct a supportability analysis that is based on those documents. But if the consultant's report does not clearly identify the documents that support their opinions, then the ALJ's ability to conduct separate supportability and consistency analyses will be limited. *See Kenneth B. v. Comm'r of Soc. Sec.*, No. 3:22-cv-672, 2024 U.S. Dist. LEXIS 49191 (W.D. Ky. Mar. 19, 2024) (citing *Tyrone H. v. Comm'r of Soc. Sec.*, No. 2:22-cv-3652, 2023 WL 2623571, *6 (S.D. Ohio Mar. 24, 2023)).

Because they are the most important factors, the ALJ is required not only to consider the supportability and consistency of all medical opinions in the record, but also to "explain *how* he or she considered them."[5] *Dayna S. v. Comm'r of Soc. Sec.*, 3:21-CV-00326, 2023 WL 2009135, at *5 (S.D. Ohio Feb. 15, 2023) (Gentry, M.J.) (citing to 20 C.F.R. § 416.920c(b)(2) (internal punctuation omitted and emphasis added)). No "specific level of detail" is required, as "the appropriate level of articulation will necessarily depend on the unique circumstances of each claim." *Timothy B. v. Comm'r of Soc. Sec.*, No. 2:22-CV-03834, 2023 WL 3764304, at *7 (S.D. Ohio June 1, 2023) (Bowman, M.J.) (internal citations omitted). Thus, ALJs need not use "magic words or any specific phrasing" to comply with the applicable regulations. *Id.*

Nevertheless, an ALJ is required "to show his or her work." *Scott K. v. Comm'r of Soc. Sec.*, No. 3:21-CV-00129, 2022 WL 4484603, at *4 (S.D. Ohio Sept. 27, 2022) (Silvain, M.J.) (internal citation omitted). Thus, "[t]his Court cannot uphold an ALJ's decision, even if there if there is enough evidence in the record to support the decision,

---

[5] By contrast, the ALJ "may, but [is] not required to," explain the consideration given to the remaining factors. 20 C.F.R. § 404.1520c(b)(2).

where the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (cleaned up) (internal quotations and citation omitted). *See also Danyel P. v. Comm'r of Soc. Sec.*, No. 2:21-CV-02405, 2022 WL 1514170, at *6 (S.D. Ohio May 13, 2022) (Preston Deavers, M.J.) (ALJ's "inexplicable and illogical consistency" warranted remand); *Kimberly S. v. Comm'r of Soc. Sec.*, No. 3:21-CV-00310, 2022 WL 17820565, at *3 (S.D. Ohio Dec. 20, 2022) (Silvain, M.J.) (ALJs must "provide a coherent explanation of [their] reasoning . . . in order to provide sufficient rationale for a reviewing adjudicator or court"); *Hardiman v. Comm'r of Soc. Sec.*, No. 2:12-CV-00508, 2013 WL 3762266, at *5 (S.D. Ohio July 16, 2013) (Preston Deavers, M.J.) (remanding case on the ground that "the ALJ's decision is internally inconsistent and incomplete").

### B. The ALJ Reversibly Erred When Evaluating The Opinions Of Consultative Psychologist Dr. Dubbeling.

#### 1. Supportability

The ALJ stated that he was unpersuaded by Dr. Dubbeling's opinions. (Decision, Doc. No. 7-8 at PageID 814.) He reasoned that Dr. Dubbeling's examination report did "not support the extent of the limitations he opined." (*Id.*) With this statement, the ALJ arguably explained his consideration of the supportability factor as required by 20 C.F.R. § 416.920c(c)(1). However, the ALJ's supportability analysis is not supported by substantial evidence.

The ALJ acknowledged that Dr. Dubbeling noted Plaintiff's subjective reports of daily ideas of reference, and documented examination findings of an anxious mood and

15

an "inability to list the month of the year backwards and perform some arithmetic." (Decision, Doc. No. 7-8 at PageID 814.) The ALJ contrasted this evidence with other normal examination findings that Dr. Dubbeling observed, including full orientation, adequate grooming, cooperative and relaxed behavior, good eye contact, normal speech, intact abstract thinking, average intellectual functioning, an ability to interpret proverbs, intact insight, and intact immediate, short-term, and remote memory. (*Id.*)

However, the ALJ apparently did not consider the explanations that Dr. Dubbeling gave to support his opinions. Dr. Dubbeling provided a detailed explanation of why he found Plaintiff "[s]eriously limited" or "[u]nable to meet competitive standards" in most of the mental abilities and aptitudes that were listed in each section of the form. (AR, Doc. No. 7-7 at PageID 790-91.) For example, in the area of completing unskilled work, Dr. Dubbeling cited Plaintiff's history of sexual assault and noted that she "grew up in a dysfunctional family." (*Id.* at PageID 790.) He explained that Plaintiff "is poorly socialized and prefers to isolate herself." (*Id.*) To support his opinion about Plaintiff's difficulties with completing semiskilled and skilled work, Dr. Dubbeling explained: "Mental status is positive for almost constant depression and social anxiety." (*Id.* at PageID 791.) Finally, to support his opinion that Plaintiff was unable to meet competitive standards in several areas of work-related functioning, Dr. Dubbeling wrote that Plaintiff "lacks common sense and basic interactional skills to interact normally with the general public." (*Id.*) He further explained that Plaintiff "has limited standards of neatness and cleanliness" and would be "rather anxious if she has to travel to unfamiliar places due to social anxiety." (*Id.*)

16

The ALJ's heavy reliance on Dr. Dubbeling's normal examination findings, when combined with his failure to evaluate or even acknowledge Dr. Dubbeling's detailed explanations in support of his opinions, shows that the ALJ ignored significant evidence that supports Plaintiff's mental health complaints and Dr. Dubbeling's opinions. The undersigned therefore finds that the ALJ's conclusions regarding supportability are not supported by substantial evidence.

### 2.    Consistency

The ALJ stated that Dr. Dubbeling's opinions were "not fully consistent with the record as a whole." (Decision, Doc. No. 7-8 at PageID 814.) Although the ALJ explained his consideration of the consistency factor as required by 20 C.F.R. § 416.920(c)(2), this conclusion, too, is unsupported by substantial evidence.

The ALJ acknowledged that Plaintiff had been hospitalized during the relevant period for suicidal ideation and plans, but reasoned that "her medications were adjusted and her symptoms improved, and she was discharged in stable condition." (Decision, Doc. No. 7-8 at PageID 814.) The ALJ also acknowledged that mental status examinations showed a depressed mood and fair insight and judgment, but contrasted them with normal findings. (*Id.*) However, both of these conclusions rely on a misleading picture of Plaintiff's symptoms and response to treatment. The ALJ ignored significant evidence that Plaintiff required many adjustments to her medications, and continued to exhibit and complain of significant anxiety and panic symptoms despite these changes.

For example, shortly after the SSI application date, in January 2018, Plaintiff told her mental health provider that she had been feeling "really low" with "more bad days

than good." (AR, Doc. No. 7-7 at PageID 472.) The mental status examination showed a euthymic but depressed mood and an appropriate yet tearful affect. (*Id.*) Plaintiff also endorsed transient thoughts of suicide albeit with no plans. (*Id.*) Marie McGinnis, P.A.-C. continued Plaintiff on Lexapro and prescribed Abilify. (*Id.* at PageID 473-74.)

Plaintiff reported some improvement in her symptoms later in January 2018 and again in March 2018. (AR, Doc. No. 7-7 at PageID 475, 478.) However, Plaintiff stated in April 2018 that Lexapro was no longer helping as much (*id.* at PageID 496), and told her therapist in May 2018 that she was having four to five panic attacks per week. (*Id.* at PageID 584.) Although Plaintiff reported relatively stable symptoms during therapy sessions in June 2018 (*id.* at PageID 586, 588), she reported suicidal ideation at the next visit in July 2018. (*Id.* at PageID 590.) In fact, Plaintiff's therapist noted that Plaintiff had a five-minute panic attack during the July 2018 session. (*Id.* at PageID 590.)

Plaintiff told her family physician in August 2018 that her depression was a "little better," and a mental status examination later that month was essentially normal. (AR, Doc. No. 7-7 at PageID 509, 572-73.) But at mental health visits in late August and September 2018, Plaintiff reported worsening symptoms and suicidal ideation. (*Id.* at PageID 594, 596, 575.) Ms. McGinnis referred Plaintiff to the emergency department, and Plaintiff was hospitalized for treatment of suicidal thoughts. (*Id.* at PageID 544-50.)

Plaintiff's providers documented relatively stable symptoms for a few weeks after the September 2018 hospitalization. (AR, Doc. No. 7-7 at PageID 578, 598, 600.) However, on October 17, 2018, Plaintiff's therapist again reported that Plaintiff had a panic attack during the session. (*Id.* at PageID 602.) When Plaintiff reported daily panic

18

attacks and recent suicidal thoughts in November 2018, Ms. McGinnis added Buspar to Plaintiff's medication regimen. (*Id.* at PageID 583.)

Progress notes dated through February 2019 documented Plaintiff's continued complaints of frequent panic attacks, increased depression and anxiety, night terrors and flashbacks related to prior abuse, and increased stress. (AR, Doc. No. 7-7 at PageID 606, 608, 610, 612, 614, 616, 618, 702, 712.) Ms. McGinnis consistently documented a depressed mood and sad affect. (*Id.* at PageID 581, 702, 712.)  Plaintiff was again hospitalized for increased depression, flashbacks, and suicidal ideation from February 8 to 11, 2019. (*Id.* at PageID 641-48.)

Plaintiff's symptoms remained relatively stable for only a few months after that hospitalization. (*See, e.g.,* AR, Doc. No. 7-7 at PageID 622, 722, 726-27.) Beginning in June 2019, Plaintiff again began complaining of worsening symptoms. (*Id.* at PageID 751.) Plaintiff told Ms. McGinnis that she had been experiencing "more bad days than good," and reported suicidal ideation and self-injurious behavior during the past month. (*Id.*) Ms. McGinnis noted that a mental status examination showed a depressed mood with only fair insight and judgment. (*Id.* at PageID 751-52.)

In July 2019, Plaintiff said she had been experiencing nightmares because of a recent sexual assault. (*Id.* at PageID 760.) Later that month, Plaintiff's therapist noted that Plaintiff appeared "sad [with] low energy," and Plaintiff reported another episode of suicidal ideation. (*Id.* at PageID 763.) In August 2019, Plaintiff reported increased depression, as well as tiredness and irritability, despite taking her medications as

19

prescribed. (*Id.* at PageID 767.) Ms. McGinnis documented a depressed mood and increased Plaintiff's Zoloft dosage. (*Id.* at PageID 767-69.)

Plaintiff reported another sexual assault in September 2019, and told her therapist that she was experiencing flashbacks and disassociations. (*Id.* at PageID 772, 777.) She told Ms. McGinnis in October 2019 that she was continuing to experience disassociations, and Ms. McGinnis again documented a depressed mood with only fair insight and judgment. (*Id.* at PageID 781.) Plaintiff told her therapist in November 2019 that she was continuing to have panic attacks. (*Id.* at PageID 785.)

Plaintiff was hospitalized for pneumonia in January 2020. (AR, Doc. No. 7-16 at PageID 1414.) At her next visit with Ms. McGinnis in March 2020, Plaintiff reported "frequent depressive symptoms." (AR, Doc. No. 7-13 at PageID 1068.) Ms. McGinnis reported that a mental status examination showed a depressed mood and flat affect. (*Id.* at PageID 1071.) In April 2020, Plaintiff complained of continued depressive symptoms and said that "good days and bad days are 50/50." (*Id.* at PageID 1074.)

In May 2020, Plaintiff told Ms. McGinnis that she had been hearing voices for the past few weeks. (*Id.* at PageID 1080.) Upon Ms. McGinnis' referral, Plaintiff presented to an emergency room and was hospitalized for treatment of suicidal ideation from May 15 to 17, 2020. (AR, Doc. No. 7-16 at PageID 1454-61.) When Plaintiff saw Ms. McGinnis in follow-up on May 19, 2020, Ms. McGinnis increased Plaintiff's Zoloft dosage. (*Id.* at PageID 1087.)

Despite frequent adjustments to her medications, Plaintiff's symptoms continued to wax and wane, and she reported elevated symptoms more often than not. For example,

Plaintiff told Ms. McGinnis in September 2020 that she had been "feeling numb" for the past month. (AR, Doc. No. 7-13 at PageID 1115.) Ms. McGinnis documented a depressed mood with a mildly impaired ability to make reasonable decisions, and increased Plaintiff's Vraylar dosage. (*Id.* at PageID 1116-20.) Plaintiff stated in October 2020 that she continued to feel numb and had experienced episodes of disassociation. (*Id.* at PageID 1122.) Ms. McGinnis again documented a depressed mood, and increased Plaintiff's Cogentin dosage. (*Id.* at PageID 1123.) Plaintiff reported increased anxiety in November 2020. (*Id.* at PageID 1129.)

In December 2020, Plaintiff complained of "more down days than good days," and Ms. McGinnis increased Plaintiff's Zoloft dosage. (AR, Doc. No. 7-13 at PageID 1136-37.) Plaintiff reported more frequent and more severe disassociations in January 2021. (AR, Doc. No. 7-14 at PageID 1145.) Ms. McGinnis documented a depressed mood, flat affect, and depressive thought content, and increased Plaintiff's Vraylar dosage. (*Id.* at PageID 1144-48.) Plaintiff reported some improvement with the increased Vraylar dosage later that month. (*Id.* at PageID1151.) However, Plaintiff reported "bothersome" mood swings in February 2021. (*Id.* at PageID 1158.) Ms. McGinnis documented a depressed mood, constricted affect, and depressive thought content, and again increased Plaintiff's Vraylar dosage. (*Id.* at PageID 1159-62.) She also restarted Hydroxyzine. (*Id.*)

Later in February 2021, Plaintiff said that although her mood was "more stable," she had experienced a low mood for the past two weeks, as well as an episode of suicidal ideation. (AR, Doc. No. 7-14 at PageID 1165.) In March 2021, Plaintiff reported continued mood swings. (*Id.* at PageID 1172.) Ms. McGinnis documented a depressed

21

mood and flat affect, and added Vyvanse to Plaintiff's mediation regimen. (*Id.* at PageID 1173-76.)

Later in March 2021, Plaintiff told Ms. McGinnis that her mood swings were less frequent. (AR, Doc. No. 7-14 at PageID 1179.) Ms. McGinnis documented a neutral mood with a constricted affect, as well as a mildly impaired ability to make reasonable decisions. (*Id.* at PageID 1183-84.) Although Plaintiff reported a stable mood in April 2021, she also complained of high anxiety. (*Id.* at PageID 1186.) Ms. McGinnis documented an anxious and depressed mood and increased Plaintiff's Vyvanse dosage. (*Id.* at PageID 1187-90.)

Plaintiff again reported high anxiety in May 2021 and attributed her symptoms to situational stressors. (*Id.* at PageID 1193.) In June 2021, Plaintiff endorsed depressive symptoms and attributed them to a lack of sleep. (*Id.* at PageID 1199.) She also reported auditory hallucinations. (*Id.*) Ms. McGinnis reported that Plaintiff exhibited a depressed mood, flat affect, and a mildly impaired ability to made reasonable decisions. (*Id.* at PageID 1203-04.)

Plaintiff reported high levels of depression in August 2021. (*Id.* at PageID 1206.) Ms. McGinnis documented a depressed mood, constricted affect, depressive thought content, and a mildly impaired ability to make reasonable decisions, and she prescribed Trazodone. (*Id.* at PageID 1207-11.) Plaintiff reported no significant changes in September 2021 and said that her sleep had improved. (*Id.* at PageID 1213.) But in October 2021, Plaintiff complained of high depression, auditory hallucinations, and self-injurious behavior. (*Id.* at PageID 1220.) According to Ms. McGinnis, Plaintiff exhibited

a depressed mood, a constricted affect, depressive thought content, and a mildly impaired ability to make reasonable decisions. (*Id.* at PageID 1224-25.) She increased Plaintiff's Zoloft dosage. (*Id.* at PageID 1221.)

Despite medication compliance, Plaintiff reported continued mood swings and auditory command hallucinations to hurt herself in November 2021. (AR, Doc. No. 7-14 at PageID 1227.) Ms. McGinnis documented a depressed mood, constricted affect and depressive thought content; she stopped Vraylar and started Rexulti. (Id. at PageID 1228-32.) Although Plaintiff stated later that month that she was doing "alright," she stated that irritability and disassociations occurred "every other day." (*Id.* at PageID 1234.)

In December 2021, Plaintiff said that she was supporting her friends who had mental health symptoms, but also reported fatigue and stated that auditory hallucinations occurred several times per week. (AR, Doc. No. 7-14 at PageID 1241.) She also reported suicidal ideation a few days earlier. (*Id.*) Ms. McGinnis increased Plaintiff's Rexulti dosage. (*Id.* at PageID 1242.)

Plaintiff's symptoms were relatively stable during the first few months of 2022. She stated in January 2022 that she was feeling "much better" and had experienced only "a couple" of auditory hallucinations. (AR, Doc. No. 7-15 at PageID 1296.) In February 2022, Plaintiff rated her depression at just a five (on a scale of one to ten, with ten the highest), but still complained of continued auditory hallucinations. (Id. at PageID 1303.) Ms. McGinnis restarted Plaintiff on Vyvanse. (Id. at PageID 1304.) Plaintiff reported a low mood with no other significant symptoms in April 2022. (*Id.* at PageID 1313.)

23

Shortly thereafter, however, Plaintiff again began reporting increased mental health symptoms. In May 2022, Plaintiff complained of a low mood, high anxiety, and continued auditory hallucinations. (AR, Doc. No. 7-15 at PageID 1320.) According to Ms. McGinnis, Plaintiff exhibited a depressed mood, a constricted affect, and a mildly impaired ability to make reasonable decisions. (*Id.* at PageID 1323-25.) Ms. McGinnis decreased Plaintiff's Vyvanse dosage. (*Id.* at PageID 1320.)

In July 2022, Plaintiff reported "more depressed days than good days." (*Id.* at PageID 1327.) After being hospitalized for sepsis in September 2022, she told Ms. McGinnis that Hydroxyzine was not helping her anxiety and that she was experiencing auditory hallucinations in the form of a voice that told her to harm herself. (*Id.* at PageID 1334.) Ms. McGinnis documented a depressed and anxious mood, a flat affect, and concrete thought processes. (*Id.* at PageID 1337-39.) She increased Plaintiff's Buspar dosage and stopped Cogentin and Hydroxyzine. (*Id.* at PageID 1335.)

Plaintiff reported a "significantly worse" mood and suicidal ideation at the next visit in October 2022. (*Id.* at PageID 1341.) Ms. McGinnis reported that the mental status examination showed a depressed mood, a constricted affect, depressive and self-deprecatory thoughts, and a mildly impaired ability to make reasonable decisions, and she added Wellbutrin to Plaintiff's medication regimen. (*Id.* at PageID 1342-46.) Later that month, Plaintiff said she had not yet started taking Wellbutrin "due to insurance issues." (*Id.* at PageID 1348.) She also stated that her anxiety and auditory hallucinations had been "bad." (*Id.*)

In November 2022, Plaintiff stated that although she had started taking Wellbutrin, she had experienced a few "mental breakdown days." (*Id.* at PageID 1354.) She also said that she continued to experience intrusive thoughts and auditory hallucinations. (*Id.*) Although Plaintiff reported a fair mood in December 2022, she complained of "a few episodes" related to her mood and reported auditory hallucinations. (*Id.* at PageID 1361.) Ms. McGinnis documented a depressed mood, a flat affect, and a mildly impaired ability to make reasonable decisions. (*Id.* at PageID 1364-66.)

Plaintiff reported in January 2023 that she was "significantly more depressed" and had experienced suicidal ideation. (AR, Doc. No. 7-16 at PageID 1369.) Ms. McGinnis documented a depressed mood, a constricted affect, depressive thought content, and a mildly impaired ability to make reasonable decisions. (*Id.* at PageID 1372-74.) She increased Plaintiff's Wellbutrin dosage, and Plaintiff stated later that month that her depressive symptoms had "somewhat" improved. (*Id.* at PageID 1370, 1376.)

In February 2023, however, Plaintiff complained of elevated depression and visual hallucinations. (AR, Doc. No. 7-16 at PageID 1383.) Ms. McGinnis stopped Wellbutrin and started Plaintiff on Auvelity. (*Id.* at PageID 1385.) Plaintiff rated her depression at a seven out of ten in March 2023, and she said she trouble filling the Auvelity prescription because of insurance issues. (*Id.* at PageID 1390.) Plaintiff started that medication later in the month but again rated her depression at a seven out of ten. (*Id.* at PageID 1635.) She also reported an increase in disassociations. (*Id.*) Ms. McGinnis documented a depressed mood, a constricted affect, depressive thought content, and a mildly impaired ability to make reasonable decisions. (*Id.* at PageID 1638-40.)

Plaintiff told Ms. McGinnis in April 2023 that her depression remained elevated. (*Id.* at PageID 1642.) She also stated that her medication made her feel drowsy and that she experienced auditory hallucinations that told her to harm herself approximately seven to eight times per week. (*Id.*) In May 2023, Plaintiff complained that she continued to feel down and depressed and that her energy and motivation were low. (*Id.*)

Although Plaintiff stated in June 2023 that she was "doing well, for the most part," she reported several recent triggers related to prior abuse. (AR, Doc. No. 7-16 at PageID 1656.) Less than two months later, in August 2023, Plaintiff was hospitalized overnight for suicidal ideation and flashbacks to prior sexual assaults. (AR, Doc. No. 7-17 at PageID 1732-39.)

In sum, although Plaintiff's mental status examinations showed some normal findings, she sometimes did better on medications, and her symptoms sometimes were stabilized after being hospitalized, the overall record shows that her symptoms only improved briefly and sporadically. On numerous occasions, Plaintiff's subjective complaints showed that she often experienced depression and anxiety symptoms, auditory hallucinations, panic attacks, and suicidal ideation even while taking her medications. Further, her mental status examinations often showed a depressed mood, flat affect, depressive thought content, and a mildly impaired ability to make reasonable decisions. The ALJ's analysis of the consistency factor is not supported by substantial evidence because it does not acknowledge or address the significant evidence in the record that supports Plaintiff's mental health complaints and Dr. Dubbeling's opinions.

The ALJ also reasoned that Dr. Dubbeling's opinions were inconsistent with mental health progress notes that "reflect that she led a fairly active lifestyle." (Decision, Doc. No. 7-8 at PageID 814.) Although the ability to perform activities such as "household tasks, hobbies . . . or social programs" is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 416.972, "[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments." *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x. 515, 532 (6th Cir. 2014) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997); *Blacha v. Sec. of Health & Hum. Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)). However, "[t]he regulations require an ALJ to measure the claimant's RFC in terms of their ability to perform work on a sustained basis for a forty-hour work week." *Lindsey v. Comm'r of Soc. Sec.*, No. 3:20cv1127-JGC, 2021 U.S. Dist. LEXIS 187551, at *11 (N.D. Ohio Sept. 30, 2021) (citation omitted); *see also Decorrevont v. Comm'r of Soc. Sec.*, No. 1:19-cv-137, 2020 U.S. Dist. LEXIS 1597, at *41 (S.D. Ohio Jan. 6, 2020) (Litkovitz, M.J.) (the ALJ did not explain how the plaintiff's daily activities were "inconsistent with the ability to perform sustained work activity [eight] hours each day and [five] days per week").

Here, the ALJ relied on the fact that Plaintiff was "able to sell her artwork, keep up a fan page, participate in craft shows, attend concerts, engage with strangers at coffee shops and parks, attend parties, visit with friends, go on dates, and drive to Chicago and Texas" to discount Dr. Dubbeling's opinions. (Decision, Doc. No. 7-8 at PageID 814.) But the ALJ did not explain why these activities—which occurred sporadically over the four-and-a-half-year period from the application date to the date of the ALJ's decision—

are inconsistent with an ability to perform full-time work activity on a sustained basis. The ALJ also did not explain how the ability to perform these activities shows that Plaintiff is capable of sustained unskilled, semi-skilled, or skilled work on a full-time basis. Nor did the ALJ explain how these activities show that Plaintiff can be around supervisors and coworkers without restriction in a work setting on a full-time basis. Thus, the ALJ's reliance on these activities when analyzing the consistency factor is not supported by substantial evidence.

### 3.      Conclusion

In sum, the undersigned concludes that the ALJ erroneously failed to acknowledge or address significant evidence that supports Plaintiff's mental health complaints when he discounted Dr. Dubbeling's opinions. The Court is unpersuaded by Defendant's argument that "Plaintiff's claims are simply a disagreement with how the ALJ weighed the evidence and a request that this Court reweigh that same evidence." (Mem. In Opp., Doc. No. 10 at PageID 1799 (citing *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at *2 (6th Cir. Dec. 1, 2022).) The undersigned recognizes that the ALJ need not discuss each and every piece of evidence and finding in the record. *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 n.11 (6th Cir. 2014). Nevertheless, the ALJ's "factual findings as a whole" must show that he "implicitly resolved the conflicts in the evidence." *Id.*

Here, the ALJ's failure to acknowledge the ongoing difficulties that Plaintiff experienced despite changes to her medication regimen shows that the ALJ did not resolve the conflicts in the evidence. The ALJ's apparent failure to consider significant

evidence that contradicts his conclusions signifies an impermissibly selective review of the record. See *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723-24 (6th Cir. 2014) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis)); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports"). For these reasons, the undersigned concludes that the ALJ's analyses of the supportability and consistency factors with respect to Dr. Dubbeling's opinions are not supported by substantial evidence.

### C. The ALJ Reversibly Erred When Evaluating The State Agency Psychological Consultants' Findings.

#### 1. Supportability

The ALJ was unpersuaded by the findings of the state agency psychological consultants. (Decision, Doc. No. 7-8 at PageID 814.) He reasoned that the consultants "failed to support the need for a limitation to [one- to four]-step instructions, changes to be explained in advance, or to intermittent contact." (*Id.*) He further explained that the consultants "noted that the evidence does not show any cognitive limitations" and "did not provide detailed citations to the record to support the specific limitations they indicated." (*Id.* at PageID 814-15.)

The ALJ adequately explained his consideration of the supportability factor as required by 20 C.F.R. § 416.920c(c)(1). Based on a review of the record, the undersigned finds that the ALJ's supportability conclusion is supported by substantial evidence.

29

### 2. Consistency

The ALJ's analysis of the consistency factor under 20 C.F. R. § 416.920c(c)(2) is also adequately explained, but it is not supported by substantial evidence. The ALJ stated that the consultants' opinions were "inconsistent with the record." (Decision, Doc. No. 7-8 at PageID 815.) The ALJ's explanation of this conclusion closely mirrors his analysis of the consistency factor with respect to Dr. Dubbeling's opinions. Accordingly, for the same reasons described in the prior section, the undersigned concludes that the ALJ's consistency analysis of the consultants' opinions is unsupported by substantial evidence.

In sum, the ALJ acknowledged that mental status examinations showed a depressed mood and flat affect, but he contrasted this evidence with normal findings. (Decision, Doc. No. 7-8 at PageID 815.) The ALJ also noted that progress notes showed "no reported difficulty interacting with various providers during her numerous medical and mental health counseling visits." (*Id.*) But the ALJ's summary of the evidence ignores significant evidence that supports Plaintiff's mental health complaints and the consultants' opinions. Although the behavioral health progress notes document some normal mental status findings and indicate that Plaintiff sometimes did well on medications, the ALJ failed to consider that Plaintiff was hospitalized on several occasions for suicidal ideation and improved for only brief periods of time after she was treated and discharged. (AR, Doc. Nos. 7-7 at PageID 544-50, 641-48; 7-16 at PageID 1454-61; 7-17 at PageID 1732-39.)  Additionally, the ALJ's statement that the examinations showed "no reported difficulty interacting with various providers" ignores the medical records that document Plaintiff's consistent complaints of depression and

anxiety symptoms, panic attacks, auditory hallucinations, and suicidal ideation despite regular changes to her medications. (*See, e.g.,* AR, Doc. Nos. 7-7 at PageID 496, 584, 590, 594, 596, 602, 606-18, 641-48, 702, 712, 751-52, 760, 767, 772-77, 781, 785; 7-13 at PageID 1068-71, 1080, 115, 1122-23, 1129, 1136-37; 7-14 at PageID 1144-48, 1165, 1172, 1193, 1199, 1206-11, 1220-25, 1227-32, 1242; 7-15 at PageID 1320-25, 1327, 1334-39, 1341-46, 1361; 7-16 at PageID 1369-74, 1390, 1642.) The ALJ also failed to consider that Plaintiff experienced panic attacks during several therapy sessions as documented by her therapist. (*See, e.g.*, AR, Doc. No. 7-7 at PageID 590, 602.)

As discussed above, the ALJ also discounted the consultant's opinions because Plaintiff "led a fairly active lifestyle." (Decision, Doc. No. 7-8 at PageID 815.) The ALJ cited similar examples to those that he cited when discounting Dr. Dubbeling's opinions: "She was able to sell her artwork, keep up a fan page, participate in craft shows, attend concerts, engage with strangers at coffee shops and parks, attend parties, visit with friends, go on dates, and drive to Chicago and Texas. (*Id.*) But the ALJ did not explain how the performance of these activities—which occurred sporadically over a period of four and a half years—is inconsistent with an ability to perform full-time work on a sustained basis. *Lindsey*, 2021 U.S. Dist. LEXIS 187551, at *11; *Decorrevont*, 2020 U.S. Dist. LEXIS 1597, at *41.

The ALJ's failure to acknowledge the ongoing difficulties that Plaintiff experienced while providers made changes to her medication regimen shows that the ALJ did not resolve the conflicts in the evidence. The ALJ also failed to consider Plaintiff's daily activities in the context of sustained, full-time work. The ALJ's apparent failure to

consider significant evidence that contradicts his conclusions signifies an impermissibly selective review of the record. *See Gentry*, 741 F.3d at 723-24. For these reasons, the ALJ's conclusions about the consistency of the state agency psychological consultants' opinions are unsupported by substantial evidence.

The ALJ also failed to consider the consistency of the consultant's opinions with Dr. Dubbeling's opinions. As discussed above, Dr. Dubbeling found that Plaintiff was seriously limited or unable to meet competitive standards in several work-related mental abilities. (AR, Doc. No. 7-7 at PageID 790-91.) Dr. Dubbeling's assessment appears to be consistent with (if not more limiting than) the consultants' opinions that Plaintiff could understand and remember no more than one- to four-step instructions, that she was limited to superficial and intermittent contact with others, and that major changes needed to be explained in advance and implemented gradually. (AR, Doc. No. 7-3 at PageID 87-94, 105-10.) Yet in his analysis of the consultants' opinions, the ALJ only discussed the mental status exam findings and Plaintiff's reported daily activities. (Decision, Doc. No. 7-8 at PageID 815.) The ALJ did not consider the constancy of Dr. Dubbeling's opinions when compared to the consultants' opinions. (*Id.*) For this reason, too, the ALJ's consistency analysis is unsupported by substantial evidence.

###    D.    The ALJ's Errors Are Not Harmless.

An ALJ's error cannot be excused as harmless if it prejudices the claimant on the merits or deprives her of substantial rights. *Rabbers*, 582 F.3d at 654. As discussed above, the ALJ's findings and conclusions regarding the opinions of Dr. Dubbeling and the state agency psychological consultants are not supported by substantial evidence. The

undersigned finds that the ALJ's errors are not harmless because they prejudiced Plaintiff on the merits. Therefore, reversal and remand is warranted.

There is another reason why the ALJ's errors are not harmless. As discussed above, the ALJ's findings and conclusions regarding the opinion evidence related to Plaintiff's mental impairments are not supported by substantial evidence. Because the Court cannot discern whether the ALJ ignored, rejected, or misconstrued a substantial body of medical evidence that supports Plaintiff's claims of disability, the Court cannot meaningfully review the ALJ's decision. *See Hurst v. Sec'y of Health and Hum. Servs.*, 753 F.2d 517 (6th Cir. 1985) ("It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence. It is absolutely essential for meaningful appellate review.") (citation omitted). For this reason, too, reversal and remand is warranted.

## V.     REMAND

Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under Sentence Four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.,* 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is neither overwhelming nor strong while contrary evidence is lacking. *Faucher*, 17 F.3d at 176. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g) for the reasons stated above. On remand, the ALJ should further develop the record as necessary, particularly as to the medical opinion evidence and Plaintiff's mental limitations, and evaluate the evidence of record under the applicable legal criteria mandated by the Commissioner's regulations and rulings and governing case law. The ALJ should evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his application for SSI should be granted.

**IT IS THEREFORE RECOMMENDED THAT**:

1.  Plaintiff's Statement of Errors (Doc. No. 9) be GRANTED;

2.  The Court REVERSE the Commissioner's non-disability determination;

3.  No finding be made as to whether Plaintiff was under a "disability" within the meaning of the Social Security Act;

4.  This matter be REMANDED to the Social Security Administration under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Order; and

5.  This case be terminated on the Court's docket.

*s/ Caroline H. Gentry*
Caroline H. Gentry
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days if this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).